J. SCHEER & SONS Co., INC., et al., Plaintiffs, *v.* TRAVELERS INDEMNITY COMPANY, Defendant.

Supreme Court, Special and Trial Term, New York County, June 21, 1962.

*Alexander Kosloff* and *Jacob J. Milman* for plaintiffs. *Terhune, Gibbons & Mulvehill* (*John G. Donovan* of counsel), for defendant.

SAMUEL H. HOFSTADTER, J. In this action for a declaratory judgment, the plaintiffs seek a declaration that they are included among the insured under a comprehensive automobile liability policy issued by the defendant to the Colonial Sand & Stone Co.,

Inc., and that, as a result, the defendant is bound to defend them and pay any judgment recovered against them in an action in this court instituted against them by one Moses Seifer.

Though the material facts are practically undisputed the parties interpret them differently. The corporate plaintiff, J. Scheer & Sons, Inc. (Scheer), a general contractor and builder, on August 22, 1960, by written agreement, undertook to repair a broken section of the first floor of the Aberdeen Garage at 625 West 130th Street, Manhattan, owned by Moses Seifer (Seifer). Scheer ordered from Colonial Sand & Stone Co., Inc. (Colonial) six cubic yards of concrete to be delivered at the job site on September 1, 1960. During the course of that delivery, under circumstances to be stated, Colonial's concrete mixer truck fell through the first floor to the basement of the garage. To recover for the damage to his garage building so caused, Seifer brought the action already mentioned against Scheer, Colonial, the individual plaintiff herein Herman Kagan (Kagan), an officer of Scheer in charge of the repair job on behalf of Scheer at the time, and one Faenza, the chauffeur of Colonial's truck. The complaint in that action, alleged, among other things, that at the time of Colonial's delivery of the concrete, Kagan directed Colonial's chauffeur with respect to the backing of the truck into the building.

Insuring Agreement III of Colonial's comprehensive automobile liability policy provides: " DEFINITION OF INSURED. The unqualified word ' insured ' includes the named insured and also includes any person while using an owned automobile or a hired automobile and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with his permission, and any executive officer of the named insured with respect to the use of a non-owned automobile in the business of the named insured ".

Among the conditions we find: " 7 PURPOSES OF USE DEFINED. * * * (c) Use of an automobile includes the loading and unloading thereof."

After its runner, Romano, had made the necessary measurements at the garage, Colonial sent one of its lower concrete mixer trucks, known as a " six yard camelback " to deliver the concrete. On its arrival, Kagan told Romano that the job was ready for the concrete. Romano stood on the catwalk of the truck as it was being backed in to guide it. Kagan also assisted in watching the truck back in to make certain it cleared the sprinkler heads below the ceiling. When the truck reached a point about 25 feet from the site of the repair where the concrete was to be poured, Romano stopped it. While the truck

when loaded could safely clear a waterpipe hanging from the ceiling, he believed that when empty it would be higher and not able to clear the pipe. When the truck got close to the waterpipe, Romano hopped off the catwalk and then felt the floor creak. He was, however, assured by Kagan — Romano, in his testimony refers to Kagan as Scheer, presumably because Kagan was in charge of the job for the contractor Scheer. It is clear, however, from the entire record that he must have meant Kagan, and we, therefore, use the correct name "Kagan" — that the floor was safe and that he need not worry about it. Romano told Kagan they would have to unload at this point, and Kagan replied that everything would be all right there. The chauffeur thereupon got out of the truck and walked around to the rear where he was to mix the concrete. Just then Romano felt the floor creak or vibrate again and he thereupon ordered the driver to get on his truck and drive it out of the garage slowly. In obedience to this order, the driver started his truck forward and at that moment the floor gave way and the rear of the truck went through the floor into the basement while the front remained on the first floor level. When the truck fell, it was in motion on its way out of, not entering the garage.

To mix the concrete, water must be put into the drum and the drum revolved and it takes a minimum of 10 minutes to mix a load. No step in this mixing operation had been taken when Romano directed the truck to be pulled out of the garage.

Romano had planned to pour the concrete through an extension chute which projected about 10 feet beyond the rear of the truck, to bring it closer to the spot where the concrete was to be used. While there is no explicit testimony to that effect, it seems perfectly clear that this chute had not yet been set up when the truck started to leave the building. Though the truck had momentarily come to rest, the mixing of the concrete had not yet commenced. Before any significant step toward the unloading operation could be taken the truck was ordered out of the garage by Romano, and at the time of the accident was already proceeding to leave.

In my opinion, it must be found from the foregoing facts, as to which, as already stated, there is no dispute, that when the floor caved in no part of the unloading process had begun. This is far more than a reasonably permissible inference from the established facts; it is a necessary and compelling, if, indeed, not the only justifiable one. I so find. Nothing in *Wagman* v. *American Fid. & Cas. Co.* (304 N. Y. 490) requires a contrary conclusion; the facts there were so different from those here that no analogy from the *Wagman* ruling can fairly be drawn.

Nor can the court uphold the plaintiffs' contention that Kagan's standing by, and telling the chauffeur as he was backing in that he was clearing the sprinkler heads safely, placed Scheer in control of the truck. This commonplace act of accommodation did not take the control of the truck out of the hands of the chauffeur and Romano, or make Scheer a participant in such control. Neither Scheer nor Kagan used the truck in any way; They, therefore, are not included among the insured in the policy.

Since the defendant did not insure Scheer or Kagan at all, self-evidently it can be under no duty to defend them in the Seifer action. Though the duty to defend an insured is broader than the obligation to pay (see *Goldberg* v. *Lumber Mut. Cas. Ins. Co. of N. Y.*, 297 N. Y. 148; *Grand Union Co.* v. *General Acc. Fire & Life Assur. Corp.*, 254 App. Div. 274, 280, affd. 279 N. Y. 638; *Floralbell Amusement Corp.* v. *Standard Sur. & Cas. Co. of N. Y.*, 256 App. Div. 221), that question is not reached here, because the court has already determined that the plaintiffs are not insured at all. We thus avoid the anomaly of requiring the defendant to conduct a defense when, by reason of the ruling that it cannot be called upon to pay, it has no real stake in the outcome. Besides the defendant is already defending the Seifer action on behalf of Colonial and its chauffeur, whose interests conflict with those of Scheer and Kagan.

It follows that the defendant is entitled to judgment declaring that neither Scheer nor Kagan is insured under the policy in respect of the occurrence on which the Seifer action is founded, and that the defendant is not bound to defend that action on their behalf, or to pay any recovery therein against them.